James V. GAGNES, Jr.,
Plaintiff/Appellant,

v.

KANSAS CITY, Missouri, et al.,
Defendant/Respondent.

No. WD 39690.

Missouri Court of Appeals,
Western District.

June 21, 1988.

Robert G. Wonder, Kansas City, for plaintiff/appellant.

Richard N. Ward, City Atty., Norma S. Webster, Asst. City Atty., Kansas City, for defendant/respondent.

Before MANFORD, P.J., and
TURNAGE and COVINGTON, JJ.

TURNAGE, Judge.

James V. Gagnes, Jr. filed suit against the City of Kansas City, Missouri, in three counts. Before trial he dismissed the first two counts, and the trial proceeded on count three, which alleged that his constitutional right to free speech was violated contrary to 43 U.S.C.A. Section 1983. At the conclusion of the presentation of Gagnes' case to a jury, the court sustained the City's motion for directed verdict. Gagnes now contends he made a submissible case. Affirmed.

Gagnes testified that he was employed by the City in January 1971 as the Superintendent of the Municipal Correctional Institution, commonly referred to as MCI. MCI was the facility in which persons convicted of violating city ordinances were confined after sentence.

Gagnes was under the supervision of James Reefer, the Director of the Department of Community Services. Gagnes stated that he and Reefer had a good relationship and that his performance evaluations were very high prior to 1980. In early 1980, Reefer recommended that the City enter into a contract with Jackson County, Missouri for the housing of Jackson County female prisoners at MCI. Gagnes was generally opposed to housing these persons because he felt they were incompatible with the type of persons confined in MCI since the Jackson County pris-

oners were generally involved in more serious crimes. Gagnes took the position that to accommodate the Jackson County female prisoners the City would need to hire at least nine more correction officers for MCI. Reefer told him that the most he would probably get in additional help was six.

In early 1980, Gagnes attended a hearing, apparently held by a city council committee, to consider the contract with Jackson County. Gagnes said most of the talking was done by Reefer, who was strongly in favor of entering into the contract. Gagnes stated that after the hearing concluded he entered an elevator and that, by chance, City Councilman Swyden got on the same elevator. Gagnes stated that he was acquainted with most City Council members and that they knew him. He said that Swyden inquired as to his view of the contract, and Gagnes told him that he was opposed because he did not have enough staff to handle the additional female prisoners. One of Gagnes' main contentions was that additional staff was necessary to protect the weaker persons from the stronger. Swyden asked for more information, and Gagnes supplied him with written materials on two occasions after their brief conversation in the elevator.

The Council later held another hearing, in which several members voiced opposition to the contract in the same terms used by Gagnes in his opposition voiced to Reefer. The use by Council members of Gagnes' arguments led Reefer to believe that Gagnes had been talking with City Council members. Gagnes acknowledged to Reefer that he had talked to Swyden and furnished him written material. The contract was rejected by the Council.

In June of 1980, Reefer gave Gagnes a written reprimand and reduced his pay for insubordination in attempting to influence a member of the City Council in opposition to the policy of the Department of Community Services. Gagnes appealed this decision to the City Personnel Board, but Reefer's decision was affirmed by the Board.

Gagnes testified that although he had received some letters of reprimand before the contract dispute, they were not frequent. He stated that after the contract incident he began receiving reprimands from Reefer almost weekly. He further stated that his relationship with Reefer deteriorated after this and he did not feel that he could properly run MCI because he was not given the authority or the resources to do so. Also his performance evaluations were lower after the dispute.

Gagnes' theory was that the actions of Reefer after the contract incident became harassment to the point that it created an impossible situation for Gagnes to continue in his position. He stated that he had planned to work until he reached the age of 65 but that he resigned his city employment in May of 1982, at age 58, because of the stress created by the harassing actions of Reefer. Gagnes contended he was entitled to recover the salary he would have earned between the age of 58 and 65 plus the difference between the retirement benefits he received and what he would have received had he worked to age 65.

The City contends that the court properly directed a verdict in its favor under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *City of St. Louis v. Praprotnik*, 485 U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In *Praprotnik*, the Court stated that in *Monell* it had rejected the doctrine of respondeat superior in actions under Section 1983. The Court further stated that in *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), it had undertaken to define more precisely when a decision on a single occasion may be sufficient to establish an unconstitutional municipal policy. The *Praprotnik* Court observed that in *Pembaur* it had held that only those municipal officials who have "final policy making authority" may subject the municipality to liability for their actions under Section 1983. The Court further stated that *Pembaur* had held that "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business." *Praprotnik*, 485 U.S.

at ——, 108 S.Ct. at 924, 99 L.Ed.2d at 118 (emphasis in original). The Court held in *Praprotnik* that in order to hold the city liable under Section 1983 the plaintiff must prove the existence of an unconstitutional policy. The Court was dealing in that case with a city-employed architect who contended that he had been subjected to retaliation by transfers because he had appealed certain personnel decisions affecting him. The Court stated that there was no proof that anyone in city government ever promulgated or articulated a policy of retaliation for an employee who appealed personnel decisions nor that such retaliation was directed against anyone except Praprotnik. The Court further pointed out that the makers of municipal policy in matters of personnel administration were not shown to have taken any action which led to retaliation against Praprotnik, nor was any ordinance passed designed to retaliate against him or similarly situated employees. The Court observed that, on the contrary, the City had established an independent Civil Services Commission with power to review and correct improper personnel actions.

The holding in *Praprotnik* is particularly applicable to this case. Here, Gagnes failed to show that anyone in the city government of Kansas City promulgated or articulated a policy of harassment against any employee who opposed his department's position before the City Council. Nor was there any showing that the policy makers of Kansas City, the City Council, had enacted any ordinance designed to retaliate against Gagnes or other employees similarly situated. As in *Praprotnik,* Gagnes failed to show that the makers of municipal policy in personnel matters took any action against him.

Because Gagnes failed to show that those municipal officials with final policy-making authority took any action against him, his claim under Section 1983 against the City must fail. *Praprotnik*, 485 U.S. at ——, 108 S.Ct. at 924, 99 L.Ed.2d at 118.

The judgment is affirmed.